Good morning. We have four very interesting appeals that are scheduled for oral argument this morning, and I welcome all the summer interns and law students who are here to view these arguments. I think you'll find them very interesting and informative and assist you in your legal education. And so I see that counsel are here for the first case. It's the United States of America v. Jeffrey Beard. And Ken Schwartz is here for the appellant Beard. Yvette Rhodes is here for the United States. And Mr. Schwartz, you may begin your argument. Thank you very much, Your Honor. May it please the Court. Your Honor, I am raising the issue of the denial of Mr. Beard's request for minor oral reduction because an intensive view of the facts and circumstances of this case show that Mr. Beard was substantially less culpable than the average participant in this case. This was a case of a multilevel drug conspiracy. Mr. Beard was certainly by the facts the lowest rung of this very complicated organization headed by Mr. Wilson, a very successful organization as the Court found that operated in the Fort Myers area for a period of five years. Mr. Wilson was the most successful drug dealer in that area at that time. Because it's clear that the other two issues that you have here, the obstruction of justice enhancement and the denial of his request for acceptance of responsibility, those arguments are not strong because it's clear that he punched Christopher Connor when he was checked into the office. Your Honor, in that case, the testimony came from Mr. Connor at the co-defendant sentencing where we were not present to cross-examine Mr. Connor about two very important facts. We said in the United States v. Cantilano that there's no right to confrontation at sentencing. Correct, Your Honor. However, at sentencing, due process still requires that it be reliable, that the hearsay have reliability and particularized guarantees of reliability as Remy, this Court, decided. And that did not exist in this case because there the co-defendant where he testified in the co-defendant sentencing, the co-defendant's beard hit him and not Mr. Wilson, his client. There we have the adverse situation where we did not . . . I'm sorry, I didn't mean to interrupt. But I would agree with you in any event that your strongest argument is that the Court erred by denying him a minor role reduction. So that's what you want to focus on this morning? Yes, that's right. Let me ask you one question before you get off of the topic at hand about the obstruction of justice issue. How do you respond to the district judge's observation that she had the opportunity to see Mr. Conner and evaluate him? How does that play into your argument about unreliability? Because she could not gauge his, in that context, gauge his reliability, his trustworthiness without our cross-examination of Mr. Conner about what another witness said who was in the very that this was just an altercation between these two gentlemen. They were fighting and kicking. A different story than what Mr. Conner gave. That's why I say that the Court, though the Court did have the opportunity to observe Mr. Conner, did not have all of the facts at that time. So when we came into sentencing, we had the judge's findings and that's what we had to deal with at the time. But to go to the Court's question about the minor role, Your Honor, the, this was a very successful organization and Mr. Beard was the lowest rung. And an intensive view of the facts, if the Court had looked at the 3B1 commentary, comments about the various analytical skill, the analytical tools that should be applied in a factual situation, you would see that Mr. Beard was a sporadic participant. He was working where he was involved. He was working for the mid-level participants in this conspiracy. And the average participant in this conspiracy was that mid-level drug dealer who was operating the various, we call them the trap houses, the drug places where Mr. Wilson was distributing the Mr. Beard was just a sporadic involved, sporadically involved in a couple of situations. And that, in fact, the opposite of being the average participant, Mr. Beard was so bad they wanted him out of this operate, they wanted him out of it altogether. And I've quoted those text messages in my brief where Ms. Smith says to Ms. Wilson, this guy is not interested in it. He's terrible. I'm paraphrasing now. They use that he's not interested in selling this S word and things of that nature. But how is his competence at his job as a drug dealer relevant to the minor role reduction analysis? I mean, committing a crime poorly is still committing a crime, right? Absolutely, Your Honor. But the Court found that he was, the Court's finding was only that he was active member. It's not just an active member that makes one the same as the average participant. If you look at the five criteria that the commentary outlines in 3B1.2, how much he understood the scope and structure, how much he participated in the planning and organization, how much he exercised in decision-making authority or influence decisions, what was the nature and extent of his participation, including the defendant's acts that he performed, and how much did he stand to benefit? If you looked at all of those other individuals who were the average participant, they had responsibility. They were selling the drugs for Mr. Wilson. They were collecting the money. They were there on a regular basis. In fact, when the law enforcement went in with search warrants, I think it was six or seven times in that one house alone, the north house, the main When they went to the other houses, they found the other individuals who were the co-conspirators, the average participants. Mr. Beard was never found there either. It's because he was just a sporadic guy who worked for the mid-level dealers, not very good at it, and they let him go, so he didn't rise to the average participant. He never... But there is proof in the record that he was, in fact, on numerous occasions acting as a drug dealer. How was it clear error for the district court to decline the minor role reduction? Because the court did not apply the intensive factual analysis to arrive at its opinion, and its opinion was as simple, Mr. Beard was an active member. Active member does not equate to the same as an average participant, and there are facts that support our position that he was less than the average participant, that though he was an active member, his even selling drugs, if you look at the amount that was sold by him that he was then the average amount that the conspiracy as a whole was selling. The numbers are something like 32 grams of crack cocaine and 20 grams of heroin on a daily basis. Mr. Beard, I think on the individual times he was found, one time he had 0.75 grams of heroin and 1.3 grams of crack cocaine. Let's say that we agree with you that Mr. Beard's participation in this drug trafficking conspiracy was significantly less than the others, but how do you get around the Supreme Court's opinion in Rita versus United States where they said if you get a within guideline sentence, it's presumptively reasonable, and he got a within guideline sentence. That's the big hurdle, Leslie, that you have to overcome here. Your Honor, I had cited the Hunt case from this circuit which said that a within guideline range is not presumptively reasonable. However, if that case has been overruled by the Supreme Court, we still have a situation where the minor role is not the basis of the decision here of whether it's reasonable or not. Your argument then is the key word here is presumptively, and so you can overcome a within guideline sentence if the within guideline sentence is not reasonable. Correct, that it's not reasonable, but if you just look at the issue of the minor role, you still have a separate issue, which is is he substantially less culpable than the average participant. Then you're at a different guideline range, a lower range, and then it's a question of whether the sentence is reasonable or not, and I think that's the issue here is he was less than the less substantially culpable than the average participant given the facts overall. If it had been applied correctly, I think that the court can see this is clear error and should be remanded to the district court. Thank you. All right. Thank you, Mr. Schwartz. Ms. Rhodes for the government. Good morning. May it please the court. The defendant has failed to establish procedural error in this case in the of the sentencing guidelines, particularly with regard to the minor role in this case. The evidence clearly shows that he was not substantially less culpable than the average participant in the relevant conduct for which he was held responsible. He was not the lowest member of the organization. His participation was not sporadic. He didn't work for the middle by the district court in three pages of the sentencing transcript clearly demonstrates that the minor role adjustment was properly denied in this case. With regard to the defendant's participation, the court was very conservative in its assessment of the duration of his participation. Curiously, the court relied upon the statements made by Patrick Graham and Daniel Hallman with regard to establishing that his participation began in January 2017 when their statements had him participating earlier in 2016. The level of his participation was substantial. With regard to the bookmark that the court established in January 2017, the defendant was caught with $1,700 on his person. He had just left the Nault House, which was the big house. He was going someplace else. They followed him. They know that's where he was coming from. He had distribution amounts of heroin. The heroin that he had was packaged for distribution. He also had... How much heroin was that there? It was a small quantity of heroin. Yeah, that's the thing. It was a small quantity. The packaging of it was significant, we would assert. Just to establish that he wasn't just... He was a drug dealer. It was packaged. It was a very small amount. We're looking at the PSI. It attributed 5.82 kilograms of crack cocaine to him, 3.64 kilograms of heroin, and 6.5 grams of heroin. But according to the PSI, all he ever possessed was .75 grams of heroin. That's a lot less than what was attributed to some others. I mean, 5.82 kilograms? Let's see. When he was arrested after a controlled purchase, he only had 5.32 grams of heroin that he was trying to sell for $400, and it turned out to be 5.3 grams of fentanyl. Everybody else was selling kilograms, and he was selling small amounts of grams. Well, there's a difference between what he was found in actual possession with, and what should have been attributed to him because of his level of participation. Because he was at the trap house. We had surveillance where he was at the trap house. They even, unfortunately for the defendants, they had mounted a camera inside their home, and they could see the comings and goings, and they saw him present at the trap house, at the main house on several occasions. He was also- But you would have to agree with me that the amount of drugs he sold that I just articulated was significantly less than what the organization sold on a daily basis, and yet he got the second highest sentence behind the big guy, Tony Wilson. He got that for a number of reasons that don't have anything to do with his drug dealing in this case. But I wanted to point out, first of all, the district court used the same scheme to determine the culpability and the drug quantity, and that's something they didn't object to. And the court said that the amount of the cookies was a certain amount, the amount of heroin was a certain amount, the amount of fentanyl was a certain amount, and it just used the number of days that any individual participated in a conspiracy. And Beard was- He just said that I wasn't participating to the extent that you said with regard to the number of days, and the court agreed with him and reduced the number of days down to 182. But there were other things that he was doing which supported the district court's finding. For example, he was influential, and not just to the low-level people. He was influential with regard to Wilson because the text messages that we referenced in our brief, they were looking for a new trap house because something happened with one of the trailers that they were using, and Beard made a trap house, or securing a trap house on McDaniel Drive, I think it is. It's McDaniel, I can't remember if it's a driver avenue. And they eventually ended up establishing a trap house at that McDaniel location, and that was where he delivered the whole cookie of crack cocaine, which Elizabeth Cook eventually distributed to an informant. And that cookie is significant in that the drug quantity calculations that I referred to, they said that they were distributing maybe four cookies a day with regard to the whole organization. When you've got one cookie in your possession, that's rather significant, considering all the other people who were involved in the conspiracy. How much cocaine are we talking about in a cookie? I think they say that there are like eight ounces, eight grams, I'm sorry. It's grams, a small amount of grams. Right. But he was held responsible for kilograms, large kilograms of cocaine that others were distributing. That he was also distributing. That's not in the PSI. Well, what I'm saying is that if his activity is consistent with him being in the trap houses from at least January 2017 through the 182-month period, which I think is the September, October of 2017. November it was. Yes. If he is there doing what the rest of them are doing, distributing consistent with what they are distributing. And that was his burden to show that he wasn't. And if they're doing that on a daily basis and he is actively involved, and we know that he's actively involved because they see him on surveillance. They make purchases from him. The other co-defendants put him there at the trap house doing the same things that they're doing. And so if, and he didn't object to the quantity. And so if he's not objecting to the quantity and we've established the duration of his participation, we would submit that what he was held responsible for was appropriate. In addition to which, yes, sir. They arrested him on January the 11th of 17. That's correct. Was he charged with anything? He was charged in the state court. And what happened? He was, he was arrested on those charges. That's another interesting point. That's the one he got 92 days or something. That's correct. And then what did he do after he served that sentence? He went back to dealing drugs for this organization. And so that's why the quantities kept, well, the attribution of the quantities kept on because he didn't, he didn't stop. He went on. Did he ever operate a trap house? Operate. Like the others did? The, the, the precinct's report and the evidence that we presented didn't establish that. Okay. That he operated a per se. He never operated a trap house. He did. Like others who got less time than he did and were dealing a lot more drugs than he was dealing. And he never exercised any decision-making in the organization. Well, I would disagree in that he did have some influence over Wilson's decision to establish that trap house on McDaniel Avenue. In addition to which I would submit that he was the part, at least a part, if not entirely a part of the muscle of this organization, because when they beat that rival drug dealer on the porch of the big house, he was outside. I mean, he was inside and he came outside. He didn't try to break it up. He's standing around egging those people on. And then as we know, because he got enhanced for obstruction of justice immediately after he was, after Christopher Conner was brought to the jail, immediately, he and Tony Wilson converge and he goes into the cell and he savagely attacked. Well, he punched him because he thought he was going to testify against him, but does that have anything, how does that enter into the minor role calculation? It shows his level of participation. He says he's on the lowest rung. He says that he's just having involvement with the low-level middle managers. He was influential in what was going on and it wasn't just a slight little punt. He ruptured that man's eardrum to the extent that a few days later when Conner went to a hearing before the judge, he couldn't even hear the judge. They had to get earphones to assist him in hearing, which is another thing that goes to his credibility that Judge Branch wanted to talk about. The judge not only saw him testify at Wilson's sentencing, he testified at Elizabeth Cook's trial, and then the judge actually saw him about nine days after that attack in the jail. I would imagine that the bruises were still visible and as I said, he couldn't even hear. I don't necessarily want to show my age, but I've seen Muhammad Ali box. I've seen Sonny Liston box. I've seen Sugar Ray Leonard box. I've never heard of any professional boxer hitting somebody and rupturing their eardrum. With regard to that, we say that he wasn't just a moat with regard to all the rest of these people. He was involved, he was highly influential, and therefore the defendant's burden in the district court was to show that he was substantially less involved than the average participants. We would submit that he didn't, and his burden here is to show that that was clear error, and that means that you have to be left with a firm conviction that the district court made a mistake, and we would support that the record doesn't support that. If I could just say something briefly with regard to the obstruction enhancement to the extent that I need to, our burden in the district court was to show that it was materially false, and there's no evidence that it was materially false. There's nothing to support that in the record. We've met the minimal addition of reliability standard because Connor made those statements under oath. He had a plea agreement. The plea agreement required that he cooperate. If he didn't tell the truth, he was subject to perjury charges. If he didn't tell the truth, he was not going to get the benefit that he was seeking. He was highly motivated to tell the truth because that was the only way he was going to get his sentence reduced. There was video evidence that supported that this attack occurred. There were physical evidence. There were pictures, and the district court specifically made a finding with regard to the having observed him testify at Elizabeth Cook's trial that he was a credible witness. Since they failed to meet their burden with regard to the reliability of that testimony, it was properly admitted the obstruction of justice enhancement was correct. The other findings of the district court, the other guidelines and applications were correct. This sentence is substantively reasonable. It's within the guidelines range. It's below the statutory maximum sentence, and the court properly applied the 3553A factors, so we would ask that the court affirm the sentence in all respects. Thank you. Thank you, Ms. Rhodes. Mr. Schwartz, you've reserved some time for rebuttal. Yes, I would like to address a couple of the factual points that counsel made regarding the influential characterization that he was influential. I think that vastly overstates what happened, and it's captured in a very small portion of a text that took place on September 18th in an exchange between Mr. Wilson and Ms. Smith, who was operating a trap house. The discussion between Ms. Smith and Mr. Wilson was about moving it to a different location at McDaniel Street, so it's called McDaniel Trap House. So let me see if in the PSI it reflects that he was in trap houses, but he never operated a trap house. Is that right? Correct. Okay. But as far as that point that he was influential in deciding to move to the McDaniel Trap House, the discussion was between Wilson and Smith. That was who was deciding it. And she made a comment, and I quote it on page 31 of the brief, regarding Wilson saying, hell yeah, McDaniel is a good spot. Wilson responds, hell yeah, that's what JP said. JP is Mr. Beard. And then she goes on to say, it's so many people want me to come trap out their shit, smiley face, a lot of they ask. And then they go on, and they don't talk about Mr. Beard. Clearly it's just a comment she referred to Mr. Beard saying, yeah, he says it's good too. Nothing to do with his influence, nothing to do with his making a decision, just a mere comment. Regarding the court's question about the January 17th arrest, he was arrested with just possession, not distribution. There was some disputed sentencing whether he had enough to distribute though. He did, but your honor, for even the agent who testified about it said it was maybe for a week's worth of distribution for maybe, I'm sorry, a week's worth of use, or maybe for three or four at best individuals who could have bought it from him. It was 11 small baggies, total 0.75 grams of heroin, 11 small. So what happened there was he was en banc. There's no evidence that he was selling drugs during that en banc period. He wouldn't have been able to, or he would have gone back to jail. And then he goes to jail, serves his 90-some day sentence. 92 days. 92 days, correct your honor. And then gets out around the end of July. And that's where he goes back, because he's still a drug addict, he's selling and using drugs, goes back in the North House, and he's captured on that surveillance. But even the agent admitted it was only a few days that he's seen on that video. Then in later September and October, he's with Ms. Smith, and that's where the telephone texts are relayed. And then there's that undercover sale that counsel was referring to where he sold the cookie. He didn't sell it. Let me back up. He was in a house that Ms. Smith was operating, the McDaniel's house, and Ms. Smith was operating it. The informant came in to buy the drugs, and she sends the informant in the back. Actually it wasn't the informant, it was the person with the informant, another co-conspirator. And the testimony was that JP, Mr. Beer, gave it to her. Handed it to her. And that shows that all he was doing was working there, handing it to her, with Ms. Smith operating the place. No evidence that he was the one that received any money or that he was the one making the money on it, but just that it was handed to this Ms. Cooch by Mr. Beer. The objection, the reference to the quantity, daily quantity, we did not object because that was the relevant conduct. There was no way we could object. There was no evidence that disputed that. But that was the relevant conduct per day. But as the courts pointed out, it was by far a lot more than the amounts that Mr. Beard himself was personally involved in doing. Regarding the comment that he was involved in egging on that incident outside the house, there was no evidence that he was egging anybody on. The evidence showed that there was co-conspirators who went out and attacked some rival drug dealer. Mr. Beard was identified as a person on the porch. Nothing else. He didn't have any weapons. He wasn't involved in the altercation. Merely that he was present at the house. Again, no evidence that he was substantially involved. Your Honor, I would ask that the court remand for directions that the minor role be imposed. Thank you. All right. Thank you, Mr. Schwartz. I now see that you were appointed by the court to represent Mr. Beard, and the court thanks you for your service. Thank you, Your Honor.